# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF ALABAMA

In re

TIMOTHY THOMAS MCCALLAN,

      Debtor.

_____

CARLY B. WILKINS,

      Plaintiff,

v.

JEANNE MCCALLAN,

      Defendant.

Case No. 17-30961-WRS
Chapter 7

Adv. Proc. No. 18-03084

## MEMORANDUM DECISION

This Adversary Proceeding was tried by the undersigned, without a jury, on October 4-7, 2021. Plaintiff Carly B. Wilkins, the Chapter 7 Trustee in the underlying case of Timothy McCallan, was represented by counsel Steve Olen and Defendant Jeanne McCallan was represented by counsel Orin Clayton Odom, III, and Scott D. Widerman. After the close of evidence, the Court requested that the parties file Proposed Findings of Fact and Conclusions of Law, which both parties have done. (Docs. 195-96).[1] For the reasons set out below, the Court enters judgment in favor of Plaintiff Carly B. Wilkins, the Chapter 7 Trustee, and against Defendant Jeanne McCallan, in the amount of $5,607,679.06.

_____

[1] The Defendant's husband Timothy McCallan is the Debtor in the underlying Chapter 7 bankruptcy case. Due to the nature of this case, frequent references will be made to both McCallans. References to Timothy McCallan will be made as "McCallan" and references to Jeanne McCallan will be made to "Jeanne."

## I. Findings of Fact

### A. Some History of Timothy McCallan's Debt Settlement and Debt Management Businesses and Proceedings Leading up to Now

#### 1. Keith Nelms and the Allegro Entities

This all began, from this Court's point of view, on February 22, 2010, when Keith Nelms, a lawyer in a solo practice with an office on Cobbs Ford Road in Prattville, Alabama, filed a petition in bankruptcy pursuant to Chapter 7.[2] Case No. 10-30430. Nelms had been in the debt management and debt settlement business only since 2008. Nelms did not start this business from scratch, rather he took over the business of Hess-Kennedy, a Florida concern which had been put out of business by the State of Florida in 2008. *Office of the Attorney General v. Laura Hess, Esq.*, No. 08-7686 (Cir. Ct. Broward County, Fla. July 17, 2008). Nelms began operating in Alabama under the name Allegro Law. Hess-Kennedy had been defrauding customers for years, and the State of Florida put a stop to it. As a result, McCallan moved his fraudulent debt settlement and debt management operations to Alabama, using Nelms, rather than Laura Hess as a front. The State of Alabama was put wise to this fraudulent business by Florida officials and as a result, proceedings were filed in the Circuit Court of Autauga County against the Allegro entities and Nelms himself.[3]

Nelms filed his Chapter 7 petition in an effort to stave off efforts by the State of Alabama to shut him down, as well as to stay other litigation. After Nelms filed his Chapter 7 petition,

---

[2] These facts may be gleaned from *Chase Bank USA, NA v. Nelms (In re Nelms)*, Adv. Pro. No. 10-3042, 2014 WL 3700511 (Bankr. M.D. Ala. July 24, 2014).

[3] *The State of Alabama and The Alabama Securities Commission v. Allegro Law, LLC, Allegro Financial Services, LLC, and Keith Anderson Nelms*, Civil No. CV-09-125-F, Order Granting Permanent Injunction dated February 11, 2010.

-2-

Wilkins discovered that he owned both Allegro Law and Allegro Financial Services.[4]  Wilkins promptly put both entities in bankruptcy on March 12, 2010.  (*In re Allegro financial Services, LLC*, Case No. 10-30630) (*In re Allegro Law, LLC*, Case No. 10-30631).  When Wilkins took control over more than $16 million in cash, it soon became apparent that this was not a run of the mill small business bankruptcy.  (10-30631, Doc. 55).  Wilkins began a lengthy and tortuous effort to learn about the business affairs of Nelms and the Allegro entities.  It was soon learned that there were tens of thousands of customers and more than $100,000,000 which had traveled through the bank accounts of the Allegro entities and their affiliates and confederates during the time that Nelms operated the Allegro entities.  Over the next several years, the Court heard considerable testimony from Nelms and it was soon apparent that he had no more than a rudimentary understanding of the business of the Allegro entities and very little knowledge of their financial affairs.

Shortly after Nelms filed his Chapter 7 petition, Chase Bank brought suit against him alleging fraud.  Adv. Pro. 10-3042.  On July 24, 2014, this Court entered a judgment of nondischargeability in favor of Chase Bank, and against Nelms, in the amount of $10,000,000. (Adv. Pro. 10-3042, Docs. 138, 140, 142); *Chase Bank USA, NA v. Nelms (In re Nelms)*, Adv. Pro. No. 10-3042, 2014 WL 3700511 (Bankr. M.D. Ala. July 24, 2014); *aff'd* No. 14-CV-927 (M.D. Ala., Aug. 27, 2018); appeal to 11th Cir. dismissed as untimely on December 20, 2018. (No. 18-14130).  The Supreme Court of Alabama suspended Nelms' law license for a period of 3 years in an order dated July 9, 2009.  The suspension was directly related to his activities connected to the Allegro entities.  While Nelms' bankruptcy case was pending, he telephoned a threat to the office

---

[4]  Daniel Hamm served as Trustee at the outset of these proceedings.  After Hamm retired, his associate Carly Wilkins succeeded him as Trustee.  For ease of reference, the Court will simply refer to Wilkins as the Chapter 7 Trustee for the Nelms, Allegro and McCallan cases, without attempting to distinguish work done by Hamm before his retirement.

of the undersigned. Nelms' license suspension was extended by the State Bar for 90 days as a result. As of the date of this Memorandum, Nelms' Alabama law license has not been reinstated.[5]

## 2. Wilkins v. McCallan
## AP 11-3007

As it had become apparent that Nelms was merely acting as a front for the illegal activities engaged in by the Allegro entities and before that the Hess-Kennedy organization in Florida, Wilkins expanded her investigation. Nelms was nominally running an organization serving 10's of thousands of debt management and debt settlement customers and taking in more than $100,000,000 in cash from those customers, yet he didn't seem to know what he was doing and, more importantly, a solo practitioner on Cobbs Ford Road in Prattville, Alabama did not have the infrastructure necessary to support such an organization. Large payments had been made by Allegro to an entity called AmeriCorp. It was later revealed that AmeriCorp kept all the records and controlled all of the money. Nelms was fronting the organization, using his law license to represent his clients, or customers, and shielding those behind him from scrutiny.

In an effort to look behind Nelms, Wilkins brought suit against AmeriCorp, Inc., Seton, Inc., and Timothy McCallan. Adv. Pro. 11-3007. After lengthy and pretrial proceedings, and scheduling a trial, for which McCallan, the other defendants and their lawyer did not show, this Court entered judgment in the amount of $102,000,000 in favor of Wilkins against McCallan, Seton and AmeriCorp. (11-3007, Docs. 361-62); *Wilkins v. AmeriCorp, Inc., (In re Allegro Law, LLC)*, 545 B.R. 675 (Bankr. M.D. Ala. 2016). In that Memorandum Decision, this Court described McCallan's

---

[5] As Nelms' license has now been suspended for more than 12 years, it would appear that it is tantamount to disbarment.

business as follows:

This is an extraordinary case of fraud on a massive scale that was perpetrated by Defendant Timothy McCallan ("McCallan") on thousands of victims. McCallan masterminded a debt settlement scheme in which customers were enticed into handing their money to entities controlled by McCallan with a promise that their debts would be either paid or settled. Thousands of customers signed up for debt settlement services offered by McCallan and paid him more than $100,000,000. Almost none of the money was paid to creditors of the customers as promised by McCallan. Instead McCallan, and those in league with him, siphoned off the money into a vast array of companies controlled by or closely associated with him. Among these entities were McCallan's co-defendants: AmeriCorp, Inc. ("AmeriCorp") and Seton Corp. ("Seton").

McCallan used attorneys as a "front" to perpetuate his scheme and to provide it an air of legitimacy. McCallan's scheme was most recently fronted by Keith Nelms ("Nelms"), an Alabama attorney whose license has since been suspended for his many unethical activities.2 Allegro Financial and Allegro Law (collectively "Allegro") were instrumentalities controlled by McCallan and fronted by Nelms as a law firm. Prior to Nelms, McCallan's front was Laura Hess, a Florida attorney who was disbarred for actions she took while fronting a previous iteration of McCallan's debt settlement scheme, a law firm called Hess–Kennedy.

From the viewpoint of the customer, or victim, McCallan's scheme began with mass media advertising—television, radio, billboards, etc.—designed to appeal to those in financial distress. The potential customer could call a toll-free number and speak with a representative who would then sign the customer up, promising him that his financial worries would be over. The representative would promise the customer that they would deal directly with his creditors, that all the customer would have to do is pay his money to them instead of his creditors, and that they would take care of the rest. Instead, the customer's money would be siphoned off under the guise of hidden fees and costs, the customer would be that much poorer, and he would default on his debts because his creditors would go unpaid. As the District Court has aptly noted, the effect of McCallan's debt settlement scheme on its victims was "personal economic suicide[.]" *McCallan v. Hamm*, 2012 WL 1392960, *1, 2012 U.S. Dist. LEXIS 56097, *3 (M.D. Ala. Apr. 23, 2012).

545 B.R. 675, 681–82 (internal call numbers omitted).

There are three takeaways from AP 11-3007 that are relevant to this Adversary Proceeding. First, McCallan's underlying debt settlement business was a massive fraud, designed to separate a large number of dollars from tens of thousands of people. Second, during the course of litigating AP 11-3007, McCallan and his confederates went to considerable effort to hide the true nature of his business, forcing the Trustee to do a tremendous amount of work. *See* 545 B.R. 675, 684-695 (detailing a massive effort on Wilkins' part to conduct discovery). Third, once judgment was entered, McCallan was held in contempt of court and incarcerated for more than two years for secreting more than $20 million. *Wilkins v. AmeriCorp, Inc., (In re Allegro Law, LLC)*, AP 11-3007, 2018 WL 2373639 (Bankr. M.D. Ala. May 23, 2018) (finding that McCallan was lying about and secreting assets);[6] *Wilkins v. AmeriCorp, Inc. (In re Allegro Law, LLC)*, No. 11-3007, 2019 WL 4411822 (Bankr. M.D. Ala. Sept. 17, 2019) (denying McCallan's motion for release, finding that he had secreted more than $16.2 million, and finding that incarceration had not lost its coercive effect)*; Wilkins v. AmeriCorp, Inc. (In re Allegro Law, LLC)*, 608 B.R. 888 (Bankr. M.D. Ala. 2019) (Memorandum Decision and Order continuing to hold McCallan in contempt and denying his motion for immediate release); *see also McCallan v. Wilkins*, No. 18-CV-608, 2018 WL 4409386 (M.D. Ala. Sep. 17, 2018) (dismissing appeals and warning McCallan's lawyers about filing frivolous appeals); *McCallan v. Wilkins,* No. 18-CV-117, 2018 WL 1384107 (M.D. Ala. March 19, 2018) (denying McCallan's appeal for release from incarceration).

The District Court formed an opinion of McCallan's mode of operation, stating the following in its decision affirming this Court's decision to deny McCallan's motion to compel arbitration.

---

[6] An summary of what has gone on here is contained in *Wilkins v. AmeriCorp, Inc*., 2018 WL 2373639. That is, if the reader wants to read only one of the many reported cases, this is it.

-6-

McCallan has proven himself contemptuous to compulsory court orders throughout the bankruptcy process. McCallan's stonewalling regarding these adversary claims has caused one set of lawyers to withdraw from his representation (of him and his entities), and whatever cooperation to date has been while in civil contempt and under the threat of criminal contempt punishment. From a practical viewpoint, and considering the importance of this adversary proceeding to the successful administration of the bankruptcy estate, the Court must ask itself whether the arbitration forum would adequately protect the creditors of the estate, and thereby the larger bankruptcy process. All indications are that, once the dispute is out of the Court's control, McCallan will take advantage of the lessened authority of the arbitrator in order to frustrate the proceeding. Arbitrators simply lack the full complement of mechanisms designed to ensure a party's compliance in reaching a full and fair resolution of a dispute, and resort to those mechanisms has proven necessary in this case. The result of McCallan's litigation conduct is two-fold. First, the bankruptcy interests are heightened because of the demonstrated need for the court's powers of compulsion in order to protect the interests of the consumer creditors. This proceeding is critical to resolving Nelms's bankruptcy petition (in which there are many thousands of individual creditors), and the likelihood that the arbitration forum will be abused makes the risk of sending this case to arbitration intolerable. Second, the interests in enforcing this particular arbitration agreement are lowered significantly in this case, when the party seeking the arbitration forum will utilize it as a bad-faith means to shirk liability.

*AmeriCorp v. Hamm*, No. 11-CV-677, 2012 WL 1392927, *7 (M.D. Ala. Decision dated April 23, 2012).

All of this is to say that McCallan has a long history of lying, cheating, hiding assets and records, and using others to shield himself and his ill-gotten gains. Against this backdrop, the Court will consider the specifics of this fraudulent conveyance action against McCallan's wife Jeanne.

-7-

## B. The Fraudulent Transfers

The Court has set out the transfers made by McCallan, either in his own name or through alter egos, in an Appendix which follows this Memorandum Decision. These transfers are divided into two distinct types. First, there were cash transfers to Jeanne purporting to be wages or compensation. Second, there were transfers for other than wages. Collectively, these transfers total $5,607,679.06 and will be referred to as "the transfers." In addition to the transfers made by McCallan in his own name, transfers were made in the name of Intermark Communications, The Achievable, Inc., WAV Team, Inc., Vortex Debt Group, Clear Blue Debt Solutions, Alpha Mar Group, Island Punch Beverage, LLC, Island Vibes Tours Worldwide, and Birdman, LLC. All of the nominal transferors are alter egos of McCallan and transfers from each of them to Jeanne is in fact a transfer from McCallan.

### 1. Transfers Purporting to be Wages or Compensation

Jeanne received transfers purporting to be compensation from Intermark Communications, The Achievable, WAV Team, and Vortex Debt Group. These transfers are detailed as follows:

### a. Intermark Communications

Intermark Communications was a corporation owned entirely by McCallan; Jeanne was never an owner of Intermark, nor was she a director of the company. Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 31:12-20; 32:2-10). Additionally, Jeanne testified that she was not sure that she was ever an officer of Intermark. Doc. 158 (Transcript of October 4, 2021, Hearing,

-8-

p. 33:15-20). She further testified that she did not have a set salary or hourly rate of compensation from Intermark. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 46:12-17).

McCallan, who was the owner, President, and CEO of Intermark during its entire existence, testified that Jeanne never held a formal title at Intermark between 2007 and 2011. Doc. 158-2 (Transcript of October 6, 2021, Hearing, pp. 148:11-149:2). Further, McCallan testified that he was actively involved in the operation of Intermark and was the sole person responsible for determining compensation for Intermark employees. Doc 158-2 (Transcript of October 6, 2021, Hearing, pp. 152:3-9; 179:7-12).

In 2007 Intermark paid Jeanne, and subsequently issued Defendant a W-2 for, $2,054,923.10. Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 26:24-25; 27:17-28:16; 28:17-19); Exhibit WG 71. That same year, Intermark paid McCallan, its President and CEO, zero dollars. Exhibit WG 71. In 2008, Intermark paid Jeanne, $482,049.48, then issued her a W-2 for the same amount. Doc 158 (Transcript of October 4, 2021, Hearing, pp. 28:24-29:12); Exhibit WG 71. McCallan was paid zero dollars by Intermark in 2008. Exhibit WG 71. That year, Intermark reported a loss of $1,583,761.00. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 61:15-22); Doc. 158-2 (Transcript of October 6, 2021, Hearing, p. 170:10-18); Exhibit 136. Then, in 2009, Intermark paid Jeanne $455,852.00, and again issued her a W-2 for that amount. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 29:18-24); Exs. 114; WG 71. In 2010, Intermark paid Jeanne $450,080.54, and again issued her a W-2 for that amount. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 30:6-17); Exhibit WG 71. Again, Intermark paid McCallan zero dollars. Exhibit WG 71. Finally, in 2011, Intermark paid Jeanne $17,310.39, and issued her a W-2 for that amount. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 31:1-11); Exhibit WG 79.

Jeanne was unable to identify how many hours she worked at Intermark for any time or pay period during those years, despite the substantial amount of money she received from Intermark from 2007 through 2011.  Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 39:4-10) Furthermore, she was unable to provide any time sheets, payroll records, or other documents to substantiate her purported labor provided to Intermark for those years.  Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 41:23-42:17).

In total, Jeanne received $3,460,215.51 from Intermark between 2007 and 2011.  Doc. 158-2 (Transcript of October 6, 2021, Hearing, pp. 143:15-144:1).

### b.  The Achievable, Inc.

The Achievable was another corporation owned entirely by McCallan; Jeanne was never an owner of Achievable, nor was she a director or officer of the company.  Doc. 158 (Transcript of October 4, 2021, Hearing, p. 76:17-20); Doc. 158-2 (Transcript of October 6, 2021, Hearing, p. 144:7-10).  Similar her relationship with Intermark, Jeanne did not have a set salary or hourly rate of compensation from Achievable.  Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 46:12-17; 80:18-81:11).

She was not identified in any tax return filed by Achievable as an officer of the company.  Ex. 773.  The Achievable filed personal property tax returns in Maryland in 2006, 2007, and 2008.  These returns listed Timothy McCallan as the President of Achievable.  *Id*.  The lines for the 2006 return have lines for Vice President, Secretary, and Treasurer, which were all blank.  *Id*.  On the 2007 and 2008 returns, Timothy McCallan is the only listed officer.  *Id*.  Additionally, The Achievable filed tax forms with the State of New York in 2008 and 2009, which were signed only

by McCallan and an Accounting Firm. *Id.* Further, in a document from the same accounting firm that signed the 2008 and 2009 New York tax returns, the only listed officer is McCallan as President of Achievable. *Id.* Finally, the IRS e-file Signature Authorization for Form 1120-S for 2010 for The Achievable was signed by McCallan as President of The Achievable. *Id.*

McCallan was actively involved in the operation of Achievable and was the sole person responsible for determining compensation for its employees. Doc 158-2 (Transcript of October 6, 2021, Hearing, pp. 153:16-19; 179:18-20). McCallan and Jeanne never discussed how Achievable would set her compensation. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 81:22-25).

In 2007, Achievable paid Jeanne, and subsequently issued her a W-2 for, $35,715. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 69:7-17); Exhibit WG 71. In 2008, Achievable paid Jeanne, $84,907.63, then issued her a W-2 for the same amount. Doc 158 (Transcript of October 4, 2021, Hearing, pp. 69:24-70:1); Exhibit WG 71. That same year, The Achievable reported a loss of $210,149.00. Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 74:19-25; 69:24-70:1); Exhibit 136. Then, in 2009, Achievable paid Jeanne $124,676.00, and again issued her a W-2 for that amount. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 70:6-8); Exhibit. WG 71. The Achievable reported a loss of $559,216 in 2009. Doc. 158-2 (Transcript of October 6, 2021, Hearing, pp. 171:7-172:1); Exhibit 137. In 2010, Achievable paid Jeanne $92,741.39, and again issued her a W-2 for that amount. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 70:9-11); Exhibit WG 71. That same year, Achievable lost $1,585,803.00. Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 73:21-74:10); Exhibit 138.

Just as was the case with Intermark, Jeanne was unable to identify how many hours she worked at Achievable for any time or pay period during those years, does not have time sheets or

other written records documenting any work done by her on behalf of Achievable from 2007 to 2010, nor does she know how her compensation was calculated.  Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 79:14-21; 80:14-17; 78:5-14).

In sum, Jeanne received $338,040.02 from Achievable between 2007 and 2010.

### c.  WAV Team, Inc.

WAV Team, Inc. was another corporation owned entirely by McCallan; Jeanne was never an owner of WAV Team, nor was she a director or officer of the company.  Doc. 158 (Transcript of October 4, 2021, Hearing, p. 83:13-20); Doc. 158-2 (Transcript of October 6, 2021, Hearing, p. 144:7-10).

In 2011, WAV Team paid Jeanne, and subsequently issued her a W-2 for, $38,461.50.  Doc. 158 (Transcript of October 4, 2021, Hearing, p. 83:18-24); Exhibit WG 79.  That same year, WAV Team reported a loss of $397,463.00.  Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 84:20-85:4); Exhibit 262.  Then, in 2012, WAV Team paid Jeanne $11,538.45, and again issued her a W-2 for that amount.  Doc. 158 (Transcript of October 4, 2021, Hearing, p. 83:7-12); Exhibit. 690.

Like her relationship with Intermark and Achievable, Jeanne was unable to identify how many hours she worked at WAV Team for any time or pay period during those years, does not have time sheets or other written records documenting any work done by her on behalf of WAV Team in 2011 or 2012, nor does she know how her compensation was calculated.  Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 86:5-87:5).

In sum, Jeanne received $49,999.95 from WAV Team in 2011 and 2012.

#### d. Vortex Debt Group

Vortex Debt Group was another corporation owned entirely by McCallan in which Jeanne was never an owner, director, or officer of the company. Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 87:17-88:10. Just like Jeanne's relationship with Intermark and Achievable, she did not have a set salary or hourly rate of compensation from Vortex. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 90:9-12).

In 2011, Vortex paid Jeanne, and subsequently issued her a W-2 for, $34,316.35. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 87:10-16); Exhibit WG 79. In an identical situation as with Intermark, Achievable, and WAV Team, Jeanne could not say how many hours she worked at Vortex for any time or pay period during those years, does not have time sheets or other written records documenting any work done by her on behalf of Vortex in 2011. Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 86:5-87:5).

### 2. Transfers of cash to Jeanne Other than Disguised Wages or Compensation

#### a. Hello Performance Technology

Hello Performance was a corporation owned entirely by McCallan. On May 21, 2012, McCallan transferred all the stock in Hello Performance to Jeanne for zero dollars. Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 91:24-92:8). After the stock transfer, McCallan sold two kilograms of his own gold to Lou Maddaloni Jewelers in separate transactions for $49,401 per kilogram. Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 90:11-91:19). On May 25, 2012, Lou Maddaloni Jewelers issued a check to Hello Performance for $49,401. Exhibit 214. The next

-13-

day, Lou Maddaloni Jewelers issued another check to Hello Performance for $49,401. Exhibit 215. The proceeds of these sales were transferred into Hello Performance's bank account. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 92:9-21). The proceeds from these sales were not reported on McCallan and Jeanne's 2012 tax return. Exhibit 161.

In the five months preceding the stock transfer, McCallan, by himself and through his other businesses, transferred substantial amounts of money to Hello Performance. On December 13, 2011, McCallan wired $108,675 to Hello Performance. Exhibit HP 52. On January 18, 2012, McCallan wired Hello Performance $85,000. *Id*. On February 1, 2012, McCallan wired $6,900 and then $2,900 to Hello Performance. *Id*. On March 21, 2012, McCallan wired $13,500 to Hello Performance. *Id*. On April 3, 2012, The Achievable, Inc., wired $12,000 to Hello Performance. *Id*. On April 19, 2012, WAV Team, Inc., wired $15,000 to Hello Performance. *Id*. On April 23, 2012, WAV Team, Inc., wired $13,500 to Hello Performance. *Id*. Finally, on May 15, 2012, just six days before he transferred the stock, McCallan wired $26,000 to Hello Performance. *Id*.

In short, McCallan pumped $283,475 into Hello Performance over five months, gave the company to Jeanne for no consideration, then after the stock transfer, deposited $98,802 from the sale of his own gold into the company.

### b. Vortex Debt Group

As discussed in Part I(B)(1)(d), *supra*, Vortex Debt Group was a corporation owned entirely by McCallan. According to McCallan's amended bankruptcy schedules, Vortex was inactive as of September 27, 2013. Exhibit 164.

In 2012, Vortex wired Jeanne $2,000 on November 9, $2,000 on November 21, $2,000 on

November 30, $2,000 on December 7, $2,000 on December 14, $2,000 on December 21, and $2,000 on December 28. Exhibit 240.

In 2013, Vortex made 32 wire transfers to Jeanne before the company went inactive. In January, Vortex transferred $2,000 to Jeanne by wire on January 14 and another $2,000 on January 18. Exhibit 240.

In February of 2013, Vortex wired Jeanne $1,000 on February 1, followed by another $1,000 wire on February 15, and a $2,000 wire on February 25. *Id*.

In March, Vortex wired Jeanne $2,000 on March 1, another $2,000 on March 8, a further $2,000 on March 15, yet another $2,000 on March 22, and another $2,000 on March 29. *Id*.

In April, Vortex transferred $2,000 to Jeanne on April 5, another $2,000 on April 12, then transferred $2,600 on April 19, and finally another $2,600 on April 26. *Id*.

In May, Vortex wired $2,600 to Jeanne on May 3, another $2,600 on May 10, a further $2,600 on May 17, yet another $2,600 on May 24, and another $2,600 on May 31. *Id*.

In June, Vortex transferred $2,600 to Jeanne on June 7, another $2,600 on June 14, then $2,800 on June 21. *Id*.

In July, Vortex wired Jeanne $5,600 on July 5, then $2,800 on July 12, another $2,800 on July 19, and yet another $2,800 on July 29. *Id*.

In August, Vortex wired Jeanne $2,800 on August 5, a further $2,800 on August 16, and another $2,800 on August 28. *Id*.

In September, Vortex made its final three wire transfers to Jeanne before it went inactive. On September 9, it wired Jeanne $2,800, then wired another $2,800 on September 16, and another $2,800 on September 25, two days before it went inactive. *Id*.

-15-

In total, Vortex transferred $95,000 to Jeanne before it went inactive.

After Vortex went inactive on September 27, 2013, it continued to wire Jeanne money on a regular basis. In October of 2013, Vortex wired Jeanne $2,600 on October 11 and $1,000 on October 28. *Id.* In November of 2013, Vortex wired Jeanne $2,000 on November 8 then $1,000 on November 22. *Id.* In December of 2013, Vortex transferred $1,000 to Jeanne by wire on December 6, then wired a further $1,200 on December 13, and finally transferred another $1,000 to Jeanne by wire on December 19. *Id.*

In 2014, Vortex wired Jeanne $1,050 on January 14, $2,000 on January 27, another $2,000 on January 27, $500 on February 18, $70,000 on March 24, and $850 on June 20. *Id.*

Finally, in 2015, Vortex wired Jeanne $3,000 on January 30, $3,000 on March 3, $3,000 on March 31, $2,900 on April 30, $3,000 on June 1, $3,000 on June 10, $10,000 on October 2, $5,000 on October 31, and $3,000 on December 15. Exhibit 204.

For tax years 2013, 2014, and 2015, Vortex reported paying zero wages and salaries in each of those years. Exhibits. 402, 403, & 404, respectively.

In total, Vortex wired Jeanne $220,100.00 between 2012 and 2015, despite being an inactive company for more than half of that time span.

### c. WAV Team, Inc.

As discussed in Part I(B)(1)(c), *supra*, WAV Team was a corporation entirely owned by McCallan, for which Jeanne was not an owner or officer. WAV Team was an inactive corporation as of September 26, 2014. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 124:11-18); Exhibit

164.  On September 2, 2015, despite being an inactive company for nearly a year, WAV Team issued a check to Jeanne for $12,806.56.  Exhibit 169.

### d.  Clear Blue Debt Solutions

Clear Blue Debt Solutions was another business owned entirely by McCallan.  Doc. 158 (Transcript of October 4, 2021, Hearing, p. 122:5-7).  Clear Blue Debt Solutions was an inactive company by June 2015.  Doc. 158 (Transcript of October 4, 2021, Hearing, p. 124:14-17).

On June 30, 2015, Clear Blue wired Jeanne $3,600 to Jeanne, then wired $5,000 to Jeanne on July 13, 2015, and finally wired $723.20 on August 10, 2015.  Exhibit 205.

The federal income tax return for Clear Blue reported that Clear Blue paid zero wages and salaries in 2015.  Exhibit 399.

### e.  Alpha Mar Group

Alpha Mar Group was a company not owned by McCallan, but for which McCallan provided his services as a consultant in return for consulting fees.  Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 126:13-127:13).  Instead of receiving the payments himself, McCallan directed Alpha Mar to remit the payment for his consulting services to Jeanne.

In 2015, Jeanne received five payments from Alpha Mar that were payments for McCallan's consulting services.  Exhibit AM 68.  On July 14, 2015, Alpha Mar paid Jeanne $3,680.00 and $1,487.50 in two separate transactions.  *Id*.  Then, on July 22, Jeanne received a $1,799.50 payment directly from Alpha Mar.  *Id*.  Alpha Mar then paid Jeanne $1,799.50 on October 24, 2015.  *Id*.

Finally, on December 17, 2015, Alpha Mar paid Jeanne $3,498.00. *Id*. In sum, Alpha Mar paid

Jeanne $12, 264.50 for consulting work performed by McCallan.

### f. Payment from McCallan to Jeanne's Chase Credit Card

On October 21, 2016, McCallan had a cashier's check drawn on his Seacoast Bank account

for $15,000 and payable to JP Morgan Chase. Doc. 158 (Transcript of October 4, 2021, Hearing,

p. 127:20-25). The Seacoast Bank account was an individual account in only McCallan's name.

Doc. 158 (Transcript of October 4, 2021, Hearing, p. 128:7-9). The $15,000 was paid to Jeanne's

Chase credit card, which was solely in her name. Doc. 158 (Transcript of October 4, 2021, Hearing,

p. 128:1-15); Exhibit CC 107.

### g. Island Vibes Tours Worldwide and Island Punch Beverage

In 2016, Island Punch Beverage, LLC and Island Vibes Tours Worldwide issued several

checks payable to Jeanne. Island Punch Beverage issued a $4,800 check payable to Jeanne on June

13, 2016, which Jeanne subsequently deposited into her bank account. Doc. 158 (Transcript of

October 4, 2021, Hearing, pp. 128:16-129:5); Exhibit 190. On August 19, 2016, Island Vibes issued

a $6,100 check payable to Jeanne, which Jeanne also deposited into her bank account. Doc. 158

(Transcript of October 4, 2021, Hearing, p. 129:6-10); Exhibit 366. This check had "10% payout"

on the memo line. Exhibit 366. The "10% payout" referenced in the memo line related to an

agreement between McCallan and Robert San Filippo of Island Vibes and Island Punch. Doc. 158

(Transcript of October 4, 2021, Hearing, p. 130:20-23). Then, on September 9, 2016, Island Vibes

-18-

issued a $16,000 check payable to Jeanne, which Jeanne deposited into her bank account. Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 130:24-131:5); Exhibit 369.

In total, Island Punch Beverage and Island Vibes Tours Worldwide paid $26,900 to Jeanne, which was not reported on McCallan and Jeanne's 2016 federal tax return. Exhibit 307.

### h. Transfers From Birdman, LLC

In the time frame 2008 to 2010, McCallan set up, and was grantor of, an asset trust called 333 Investment Trust. Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 134:6-7, 20-23); Doc. 158-2 (Transcript of October 6, 2021, Hearing, p. 212:13-15). Jeanne and her children were the beneficiaries of this trust. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 134:12-14). McCallan put $3.2 million into 333 Investment Trust. Doc. 158-2 (Transcript of October 6, 2021, Hearing, pp. 212: 16-19; 212:25-213:4). McCallan was the manager of 333 Investment Trust. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 135:2-5); Doc. 158-2 (Transcript of October 6, 2021, Hearing, p. 212:20-24). McCallan also set up Birdman LLC as a part of 333 Investment Trust. Doc. 158-2 (Transcript of October 6, 2021, Hearing, p. 210:21-24). 333 Investment Trust owned 95% of Birdman, and Jeanne owned only 5% of Birdman. Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 136:25-137:2). From 2011 to 2017, Birdman made numerous wire transfers to Jeanne's personal bank accounts that were held in her name only.

In November 14, 2011, Birdman wire transferred $50,000 to Jeanne's personal bank account ending in 5612. Exhibit B 23. On November 30, 2011, Birdman wired $50,000 to Jeanne's personal bank account ending in 5612. Exhibit B 24. On December 7, 2011, Birdman

-19-

wired $250,000 to Defendant's personal bank account ending in 5612.  Exhibit B 25.

On February 1, 2012, Birdman wired $75,000 to Defendant's personal bank account ending in 5612.  Exhibit B 32.  On March 12, 2012, Birdman wire transferred $150,000 to Jeanne's personal bank account ending in 5612.  Exhibit B 33.  On April 4, 2012, Birdman wired $50,000 to Jeanne's personal bank account ending in 5612.  Exhibit B 34.  On April 23, 2012, Birdman wired $23,000 to Jeanne's personal bank account ending in 5612.  Exhibit B 35.  On April 27, 2012, Birdman wired $77,000 to Jeanne's personal bank account ending in 5612.  Exhibit B 36.  On May 14, 2012, Birdman wired $150,000 to Jeanne's personal bank account ending in 5612.  Exhibit B 37.

On May 13, 2014, Birdman wired $91,000 to Jeanne's personal bank account ending in 9233.  Exhibit B40.

On February 11, 2015, Birdman wired $60,000 to Jeanne's personal bank account ending in 2622.  Exhibit B 41.  On July 22, 2015, Birdman wired $18,000 to Jeanne's personal bank account ending in 5612.  Exhibit B 42.  On October 19, 2015, Birdman wired $20,000 to Jeanne's personal bank account ending in 5612.  Exhibit B 44.

On January 5, 2016, Birdman wired $30,000 to Jeanne's personal bank account ending in 5612.  Exhibit B 45.

On May 9, 2017, Birdman wired $12,136.97 to Jeanne's personal bank account ending in 6515.  Exhibit B 46.

McCallan testified that all of the $3.2 million that he transferred into 333 Investment Trust was distributed to Jeanne as a partner of Birdman. Doc. 158-2 (Transcript of October 6, 2021,

Hearing, pp. 211:19-212:4; 16-19). The money that Birdman transferred to Jeanne originally came from 333 Investment Trust, was transferred by 333 Investment Trust to Birdman and then was transferred by Birdman to Jeanne. Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 136:5-137:2). However, Jeanne never was an employee of Birdman, did not perform any kind of services for Birdman, and did not receive any compensation from Birdman for any services. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 179:19-21). The money that Birdman transferred to Jeanne was distributions out of Birdman that originated from 333 Investment Trust, which was set up and funded by McCallan. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 153:20-23).

## C. Alter Ego and Commingling Funds

The facts concerning the transfers set out in detail above are largely undisputed by Jeanne. As is demonstrated in the list supplied in the Appendix to this Memorandum Decision, the lion's share of the transfers which are the subject of the Trustee's fraudulent conveyance action against Jeanne were not made by McCallan, rather they were made by nearly a dozen other entities. Wilkins' theory of this case is that these transfers were made by entities that were alter ego's of McCallan, such that transfers from these alter egos are, in effect, transfers from McCallan himself.

To prove her alter ego theory, McCallan called forensic accountant Alan Carroll, an accountant who has testified in this Court many times on the subject of McCallan and his related businesses. He testified as follows:

> [Olen] Q     All right.  Let's look at -- let's talk about your third -- well, let's talk about your third opinion as to whether Mr. McCallan and the entities 100 percent owned by him respected the corporate entities, the corporate form and/or whether they were commingling money.  Did you come to a opinion about that?

[Carroll] A   Yes, sir, I did.

Q     And what was your opinion on that?

A     Yes, sir.  Your Honor, I found that -- I found millions of dollars being moved around from one of these Tim McCallan controlled companies to other Tim McCallan controlled companies over a long period of time in a series of complex transactions.  Then I would find those monies being considered distributions to Mr. McCallan.  And then I would see on the other side of the equation on the Tim McCallan company receiving the money where, from another Tim McCallan company, they would consider that as a contribution as if it were made by Tim McCallan personally when it wasn't.  And so through everything I've seen, I found that over and over again where Mr. McCallan did not respect the corporate form and treated, in effect, all of these corporations as just one big ole pool of money to move things in and around and – you know, and him take credit for it, so to speak."

Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 183:11-184:8).  Carroll reviewed and analyzed

hundreds, if not thousands, of financial transactions and accounting transactions in order to form

his opinion about the disrespect for the corporate entities and the commingling of money. Doc.

158 (Transcript of October 4, 2021, Hearing, p. 158:2-17).

Carroll noted that Kellie Eckstein, a frequent witness on behalf of McCallan, had

testified, and had created a spreadsheet showing, that between $7.8 million and $7.9 million

moved between the companies owned by McCallan. Doc. 158 (Transcript of October 4, 2021,

Hearing, p. 185:5-12); Exhibit 674.  Carroll even pointed out Ms. Eckstein's own description

of the transfers:

[Olen] Q     And you have abbreviated here Ms. Eckstein's description.  She actually called the 7.8 million -- would you tell us again what she said about it, his own witness?

[Carroll] A  Yes, sir.  It was moved -- it was -- and I'm paraphrasing.  We'll look at it exactly.  But it says move -- monies moved from company to company without ever hitting Tim McCallan's personal bank account.

Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 185:25-186:6); Exhibit 674.  This is

-22-

significant in that one attempting to learn of McCallan's business affairs and transactions could not do so just by looking at accounts held in his name. Rather, he was treating money in the bank accounts of the alter egos as his money.

Carroll also pointed out that McCallan used over $1,096,000 from the companies that he 100% owned and controlled to pay personal bills and to purchase personal assets. Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 186:17-23, 189:9-16); Exhibit 674. Eckstein, on her spreadsheet, confirmed this $1,096,000 number. Exhibit 674. Checks were written or money was wired straight from these companies to whoever was providing the goods or services to McCallan. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 187:9-15); Exhibit 674. Carroll testified that this practice was improper and not respecting the corporate form.

> [Olen] Q  Now, let me go back.  Was it -- respecting the corporate form, was it appropriate for Mr. McCallan to have his various companies that he owned and controlled a hundred percent to pay for his personal bills of his and to buy personal assets for himself?
>
> [Carroll] A No, sir.  Again, it's just -- it is not respecting the corporate form when you treat the corporation's bank account as your own personal bank account, essentially.

Doc. 158 (Transcript of October 4, 2021, Hearing, p. 189:9-16).  In 2008, Seton - 100% owned and controlled by McCallan - paid $3.1 million directly to the United States Treasury and paid $825,000 directly to the State of New York, in payment of Jeanne and her husband's personal income taxes. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 188:7-18).  Carroll explained that these payments disregarded the corporate entities and were not appropriate. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 188:19-24).  Carroll explained that, with regard to the $7.8 to $7.9 million in intercompany transfers, McCallan treated that money as his personal

-23-

money. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 189:17-23). As Mr. Carroll explained,

> [Carroll] A  That's exactly right.  And, you know, the biggest of which - - and we see it over and over and over again - - is where monies are moved to and from the McCallan-controlled companies and then, essentially, on the - - the company receiving the money, they would reflect that as a contribution, additional paid-in capital or, you know, show it as being something that Mr. McCallan stuck in, contributed to the corporation, which, he in fact, did not.  It was just simply money moved amongst his companies.

Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 189:23-190:6).  As a side benefit, McCallan and Jeanne received a tax benefit from booking these bogus capital contributions.  Doc. 158 (Transcript of October 4, 2021, Hearing, p. 190:7-14).  In other words, while McCallan and Jeanne were cheating his creditors, they were also cheating Uncle Sam out of his taxes.

Intermark made payments totaling $1,072,000 directly to PHH Mortgage to pay off the mortgage on Jeanne and McCallan's house in Florida.  Doc. 158 (Transcript of October 4, 2021, Hearing, p. 191:5-12); Exhibit 500.  Mr. Carroll explained that these transactions disrespected the corporate form and treated Intermark's money and bank account like they were McCallan's personal money and bank account. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 191:13-22).  Carroll pointed out that, further disregarding the corporate entities, the money Intermark used to make these mortgage payments actually came from Seton and Pure Nutrients, yet another company 100% owned and controlled by McCallan, also was used as an intermediary in terms of the accounting for these transactions.  Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 191:23-192:19).  These transactions also disregarded the corporate integrity of Intermark and Seton. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 192:20-22).

-24-

McCallan frequently caused his companies pay his personal bills and then treated those payments as if they were for legitimate expenses of the companies. Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 193:24-194:4; 194:10-16; 195:10-14); Exhibit 676. Jeanne and McCallan both obtained tax benefits from treating these personal expenses as expenses of the companies owned and controlled by McCallan. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 194:5-22). McCallan had his companies pay for $160,000 in gold coins that he purchased for himself. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 195:17-18). McCallan and Jeanne disregarded the corporate integrity of Hello Performance when McCallan transferred the company to her for no consideration and then sold almost $100,000 of gold coins and had the sale proceeds from those coins paid to Hello Performance that was then owned by Jeanne. Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 195:21-197:8). McCallan further disregarded the corporate form by treating the sale proceeds from the coins as a capital contribution from Jeanne to Hello Performance. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 197:9-22). Wilkins offered a massive amount of evidence, both through Carroll's testimony and documentary exhibits, to the effect that McCallan used the money and property of the various alter egos as his own. This is the very essence of alter ego theory–that one person uses the money and property of another, or another entity as his own.

## D. Insolvency

Wilkins established that McCallan was insolvent at least as early as January 1, 2007. Wilkins called Alan Carroll, her forensic account, as an expert. Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 154:14-156:16); Exhibit 13A. Carroll previously testified before this court at 6 different hearings involving McCallan's bankruptcy case and related proceedings. Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 154:20-22; 158:18-20). Every time Carroll testified, he was present throughout the entirety of each hearing, and he heard and observed the testimony of Jeanne, McCallan and Kellie Eckstein on numerous occasions over a period of several years. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 159:2-15). Carroll was present throughout Jeanne's testimony at this trial. Doc. 158 (Transcript of October 4, 2021, Hearing, p. 159:16-18).

The basis for Carroll's opinion is straightforward. This Court entered a money judgment in favor of Wilkins and against McCallan for $102 million. (*Wilkins v. AmeriCorp, Inc.*, Ad. Proc. No. 11-3007, Docs. 362-63); *Allegro Law*, 545 B.R. 675 (judgment in the amount of $102 million entered on Feb. 16, 2016). The evidence in that Adversary Proceeding (11-3007) established that McCallan's fraudulent activities began at least as early as the tax year beginning January 1, 2007 and ending December 31, 2007. Carroll testified that insolvency, for purposes of fraudulent conveyance analysis, should date the time that the illegal activity began.

Having established a $102 million liability dating from January 1, 2007, McCallan's assets, whatever they may be, do not begin to approach the amount of the judgment. The Court cannot help but wonder at the rather delicious irony here. Since the outset of this Adversary Proceeding, Jeanne

-26-

has disputed Wilkins' contention that McCallan was insolvent at the time the transfers in question were made. Yet, McCallan was held in contempt for concealing assets from Wilkins. On the one hand, McCallan has been insisting that he does not have any assets from which the judgment can be paid. *See*, *Allegro Law*, Adv. Pro. No. 11-3007, 2019 WL 4411822 (Memorandum Decision entered Sept. 17, 2019) (finding that McCallan was concealing at least $16.2 million and probably more than $20 million). On the other hand, Jeanne insists that her husband was solvent, contrary to his claims in his contempt proceedings. Jeanne makes no effort to reconcile the two statements. For Jeanne to prevail on her argument that McCallan was solvent, she would have to prove that McCallan is hiding considerably more money than Wilkins believes.

The Court recognizes that Wilkins has been investigating McCallan's financial condition over a period of many years. It is certainly possible to have a positive net worth in one point in time, lose one's money, and become insolvent. This is not an uncommon occurrence in bankruptcy court. Yet, neither McCallan nor Jeanne have ever come forward with any rational, consistent picture of their finances.

Even if one doubles the $20 million that Wilkins believes McCallan is hiding, he is still insolvent when the $102 million judgment is considered. The Court further notes that Jeanne did not offer a detailed and comprehensive accounting of McCallan's net worth at her trial in this Adversary Proceeding. Rather, her lawyer quarreled with Carroll, contending that he is wrong, without offering anything definitive from which McCallan's solvency could be determined. Having considered the evidence, the Court finds that McCallan was insolvent at least as early as January 1, 2007, and at all times subsequent.

-27-

### E. Jeanne Gave No Consideration for the Transfers.

### 1. Jeanne Gave No Consideration For the Purported Wages.

As set out above, many of the transfers in question were purportedly for wages from Intermark Communications, Inc., The Achievable, Inc., and WAV Team, Inc. Wilkins' forensic accountant Alan Carroll spent considerable time investigating this issue and gave testimony at trial. Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 179-83). Carroll could find no records supporting the wages, such as time sheets, invoices, contracts or the like, and Jeanne has not at any time provided any. Moreover, Jeanne could not articulate any basis upon which her pay was based. That is, she was not paid a set amount per hour, per week, per month, or any other basis upon which compensation is usually based. Carroll testified that the wages were not reported on Jeanne's tax return. Id.

### 2. Jeanne Gave No Consideration for Other Transfers.

Carroll also gave testimony concerning other transfers. In spite of considerable effort on his part, he could not identify any consideration given by Jeanne for other transfers. Doc. 158 (Transcript of October 4, 2021, Hearing, pp. 163:18-23; 178:7-180:7). Jeanne did not offer any documentation to support her contention that consideration was paid. Moreover, her testimony at trial was self-serving and not credible.

### F. McCallan Made the Transfers With the Actual Intent to Hinder, Delay and Defraud Creditors.

The Court has documented McCallan's long history of conducting a fraudulent enterprise, attempting to defeat Wilkins' efforts to conduct discovery into his business affairs in the context of Adversary Proceeding 11-3007 and attempting to defeat Wilkins' efforts to discover his assets, and concealing his assets from the Trustee. *See* Part I(A), *supra.* These efforts have gone on for more than 10 years. Carroll testified, based upon more that 1,000 hours of investigation, that McCallan has a pattern and practice of concealing assets. Doc. 158-1 (Transcript of October 5, 2021, Hearing, pp. 16-18).

One way that McCallan concealed assets was by purchasing gold and silver coins. Doc. 158-1 (Transcript of October 5, 2021, Hearing, pp. 17:23-18:17). Mr. Carroll is convinced that there is some amount of gold and silver coins that McCallan purchased that have not yet been accounted for in terms of either being in his possession or having been sold. Doc. 158-1 (Transcript of October 5, 2021, Hearing, p. 18:18-22).

Carroll pointed out that McCallan had many hundreds of thousands of dollars in cash in two different safes in his home in New York, and Mr. Carroll emphasized that this cash has not ever been properly accounted for by McCallan. Doc. 158-1 (Transcript of October 5, 2021, Hearing, pp. 18:23-19:12). Carroll also testified that McCallan has not fully accounted to this Court for any monies held offshore. Doc. 158-1 (Transcript of October 5, 2021, Hearing, p. 19:13-18).

Carroll testified that Jeanne has not offered into evidence any business cards, any personnel files or any other documents would show a valid employer-employee relationship. Doc. 158-1

(Transcript of October 5, 2021, Hearing, pp. 22:23-23:4). Mr. Carroll's conclusion about this $3.8 million is that these transfers were a way for McCallan to use his corporations to transfer money to Jeanne.

> [Olen] Q   Did you draw the conclusion about what Mr. McCallan was doing in transferring this 3.8 million -- this approximately $3.8 million out of Intermark and Achievable to his wife, within the framework of she was never even identified within the -- you know, publicly.  Was not identified, was not in fact, an officer or employee.  You draw a conclusion from that about how these transactions were structured?
>
> [Carroll] A    Yes, sir.  Your honor, it was - - I see a mechanism where Mr. McCallan was using his corporations for which he controlled 100 percent, owned and controlled 100 percent to make transfers to his wife ultimately.  That's what I see and that's my opinion.

Doc. 158-1 (Transcript of October 5, 2021, Hearing, p. 23:5-16).  Given the fact that numerous transfers to Jeanne were not listed on Jeanne and McCallan's joint income tax returns, it was far more difficult to find these transfers. Doc. 158-1 (Transcript of October 5, 2021, Hearing, p. 29:7-13).  Carroll noted that McCallan's use of inactive companies - companies that his own sworn bankruptcy schedules identified as inactive - to transfer substantial money to Jeanne made it more difficult to discover these transfers to Jeanne. Doc. 158-1 (Transcript of October 5, 2021, Hearing, pp. 30:18-31:5).  Carroll also noted that some of the transactions where McCallan directed transfers to Jeanne through his companies were incredibly complex and convoluted. Doc. 158-1 (Transcript of October 5, 2021, Hearing,  p. 31:14-18).  The Hello Performance transfers were a good example of that. Doc. 158-1 (Transcript of October 5, 2021, Hearing, pp. 31:19-34:24).

-30-

Both Jeanne and McCallan testified in open court and were subject to cross examination. Indeed, McCallan has testified before the undersigned far more than any other litigant over the course of his career. Jeanne has also testified many times before the undersigned.[7] McCallan is a highly intelligent, energetic and charismatic individual.[8] Based upon this Court's considerable knowledge of McCallan and Jeanne, this Court is of the view that they are not credible witnesses and that they have no qualms at all of perpetrating a massive fraud on their creditors. The very complex scheme engineered by McCallan, that this Court has attempted to detail above, was done with the intent to hinder, delay and defraud the Trustee and McCallan's creditors. All of the above-described transfers were made with the intent to hinder, delay and defraud creditors.

## G. Summary of the Facts

This fraudulent conveyance action consists of dozens if not hundreds of cash transfers from McCallan to Jeanne.[9] The total amount transferred was $5,607,679.06. The transferors other than McCallan were alter egos of McCallan. Therefore, the entire $5.9 million was, in effect, transferred by McCallan to Jeanne. Jeanne did not provide any consideration for the amounts transferred. McCallan was insolvent at all times relevant to this proceeding. In the

---

[7] Most of the rulings made by the undersigned involving McCallan have gone against him, which accounts for the Motion to Recuse.

[8] It is no accident that Laura Hess and Thomas McAlpine have been disbarred and that Keith Nelms and Michael Fritz have been indefinitely suspended by the bar, and that Scott Widerman has been sanctioned by this Court and has proceedings pending before the Florida Bar. McCallan has left an incredible amount of personal and professional destruction in his wake.

[9] The Appendix details 113 amounts which were transferred. The wage transfers were summarized by year in the Appendix and not broken out separately.

alternative, McCallan made these transfers with the actual intent to hinder, delay and defraud his creditors.

## II. LAW

### A. Jurisdiction

This Court has jurisdiction over the subject matter of these claims pursuant to 28 U.S.C. § 1334(b) as it is a proceeding "arising under" Title 11. This Court has jurisdiction over the person of Jeanne because she has sufficient minimum contacts with the United States. A nearly identical question concerning this Court's subject matter jurisdiction and jurisdiction over the person of a defendant was raised in related proceedings which resulted in a published opinion. See *Wilkins v. SanFilippo (In re McCallan),* 599 B.R. 361 (Bankr. M.D. Ala. 2019) (denying defendant's motion to dismiss).

### B. Jeanne Waived Her Right to Trial By Jury and Consented to Adjudication by the Bankruptcy Court When She Did Not Timely Move to Withdraw the Reference.

On March 28, 2019, the District Court denied Jeanne's first Motion to Withdraw the Reference. *In re McCallan*, No. 2:19-MC-3854-WKW, 2019 WL 1415455 (M.D. Ala. Mar. 28, 2019). At that time, Jeanne intended to litigate this fraudulent conveyance proceeding in District Court rather than in Bankruptcy Court. The District Court denied that motion, stating that the matter should be litigated in Bankruptcy Court and not transferred to District Court until the case was ready for trial. The District Court further stated that Jeanne "may move to withdraw the reference when the case is ready for trial. The bankruptcy court shall enter a

-32-

Report and Recommendation as to findings of fact and conclusions of law on any dispositive pretrial matters." *Id*. at * 2.

On March 26, 2021, this Court denied Jeanne's Motion for Summary Judgment. (Docs. 84 & 85). At the time Jeanne's Motion for Summary Judgment was denied, this Court also ordered that "Defendant Jeanne McCallan shall have 14 days from the date of this Order to file a Motion to Withdraw the Reference with the District Court." (Doc. 84). When Jeanne did not file her motion within the 14 day period, this Court held a Scheduling Conference and set the matter for bench trial in Bankruptcy Court. (Doc. 89). Jeanne did file a tardy motion to withdraw the reference with the District Court, which it denied as untimely. (Docs. 91 & 140). The Court finds that by failing to timely file the Motion to Withdraw the Reference as required by this Court's March 26, 2021 Order, Jeanne waived her right to a jury trial and impliedly consented to final adjudication by the Bankruptcy Court. *See In re Bumshteyn*, No. 18-23930-PDR, 2022 WL 298427, at *3 (Bankr. S.D. Fla. Feb. 1, 2022) (noting a defendant's failure to timely object constitutes implied consent to adjudication by a bankruptcy court); *see also Wellness Int'l Network, Ltd. V. Sharif*, 575 U.S. 665, 685, 135 S.Ct. 1932, 1948 (2015) (stating that implied consent will "increase judicial efficiency and check gamesmanship"). For these reasons, this is a final order.

-33-

## C. The Court Properly Denied Jeanne's Motion to Recuse.

Shortly before trial, Jeanne moved to recuse the undersigned as judge, citing as evidence an email written by former counsel Michael Fritz and prior rulings made in related proceedings.[10] (Doc. 124). The email in question was shocking for several reasons. Fritz threatened suicide and blamed 11 individuals, including the undersigned and Chief Bankruptcy Judge Bess Creswell. The email used exceedingly foul and insulting language. The undersigned found the insult to Judge Creswell to be particularly objectionable, given that it was vile and misogynistic. The Court scheduled a Show Cause hearing, on the eve of trial, to determine whether Scott D. Widerman, one of Jeanne's lawyers, should be sanctioned for filing an unredacted copy of the email on the Court's record. The Court noted that, in its view, the motion to recuse was frivolous and the email was filed, not for the purpose of supporting the motion to recuse, but to insult the Court. The Court denied the motion to recuse and sanctioned

---

[10] In the experience of the undersigned, motions to recuse are rare–and should be. Yet, these proceedings have resulted in at least three such motions, and multiple appeals to the District Court and the Eleventh Circuit, resulting in a surprising amount of litigation. Keith Nelms, in proceedings related to these, moved to recuse the undersigned on the eve of his trial concerning the dischargeability of his indebtedness to Chase Bank. The undersigned denied the motion. *Chase Bank, NA v. Nelms (In re Nelms)*, No. 10-3042, 2014 WL 3700511, *13-15 (Bankr. M.D. Ala. July 24, 2014). Nelms appealed that decision to the District Court who affirmed. No. 2:14-cv-927, 2018 WL 9460085 (M.D. Ala. Oct. 23, 2018). Nelms appealed the District Court's decision to the Eleventh Circuit, who dismissed the appeal because it was filed late. *Nelms v. Chase Bank, NA,* No. 18-14130, (11th Cir. December 20, 2018).

McCallan filed a motion to recuse the undersigned on the eve of trial in Adv. Pro. 11-3007, which was denied in the judgment entered February 16, 2016. *Wilkins v. AmeriCorp, Inc. (In re Allegro Law, LLC),* 545 B.R. 675, 700-07 (Bankr. M.D. Ala. 2016). McCallan moved to take an interlocutory appeal prior to entry of the judgment. (11-3007, Doc. 342). The District Court entered a seven-page Order denying the motion on December 3, 2013. *McCallan v. Hamm*, 502 B.R. 245 (M.D. Ala. 2013). McCallan appealed the order to the Eleventh Circuit and that appeal was dismissed for lack of jurisdiction on March 4, 2014. *McCallan v. Hamm*, No. 14-10073 (11th Cir. March 4, 2014).

Jeanne filed a motion to recuse on the eve of trial in this Adversary Proceeding. (Doc. 124). This Court denied the motion by its order of September 22, 2021. (Doc. 133). Jeanne filed a Notice of Appeal on September 28, 2021. (Doc. 138). Wilkins moved to dismiss the appeal because this Court's Order denying the motion to recuse was not yet final. No. 2:21-cv-654-RAH, Doc. 2. Apparently recognizing that Wilkins was correct, Jeanne moved to voluntarily dismissed her appeal. No. 2:21-cv-654-RAH, Doc. 6. The District Court dismissed the appeal, without prejudice, by its order dated November 9, 2021. No. 2:21-cv-654-RAH, Doc. 7.

Widerman for filing an unredacted copy of the email on the Court's public record. (Docs. 161 & 162), *Wilkins v. McCallan (In re McCallan)*, 633 B.R. 903 (Bankr. M.D. Ala. 2021). The following passage from that decision is pertinent here.

> The legitimacy (or lack thereof) of Widerman's action is best understood in the context of the motion to which it relates-the Defendant's Motion to Recuse. (Doc. 124). The stated basis for the motion was the Fritz email. The Fritz email was filed by Widerman as "Exhibit A" to the motion. (Doc. 131). It should be noted that it was Odom who filed the Motion to Recuse, without attaching the offending email. No doubt he recognized the toxic nature of the email and did not want to take responsibility for filing such an obscenity on the Court's record. Perhaps Widerman, knowing that his admission to the bar of this Court was *pro hac*, reasoned that he did not have much to lose-while Odom did not want to risk his law license by making a scurrilous attack on the Court. The Trustee opposed the Motion to Recuse citing the case *United States v. Greenough*, 782 F.2d 1556, 1558 (11th Cir. 1986). The Eleventh Circuit stated in that case that:

>> There are twin, and sometimes competing, policies that bear on the application of the Section 455(a) standard. The first is that courts must not only be, but must seem to be, free of bias or prejudice. Thus the situation is viewed through the eyes of the objective person. A second policy is that a judge, having been assigned to a case, should not recuse himself on unsupported, irrational, or highly tenuous speculation. If this occurred the price of maintaining the purity of the appearance of justice would be the power of litigants or third parties to exercise a veto.

> *Greenough*, 782 F.2d at 1558.

> If a motion such as Defendant's Motion to Recuse were to be granted because her lawyer wrote a nasty email, any litigant would be granted a veto power over her judge, contrary to the rule handed down in *Greenough*.

> Defendant Jeanne McCallan cites the case of *In re Moody*, 755 F.3d 891 (11th Cir. 2014), cert. denied 574 U.S. 977, 135 S.Ct. 437, 190 L.Ed.2d 333 (2014), in support of her motion to recuse. (Doc. 124).

In *Moody*, the Defendant had been convicted of the murder of Eleventh Circuit Judge Robert Vance. Years after his conviction, Moody moved for post-conviction relief. The habeas proceeding was heard by District Judge Scott Coogler, of the Northern District of Alabama. Moody moved to recuse Judge Cooger and later moved to recuse all of the judges on the panel hearing his appeal from the District Court's denial of post-conviction relief. As Moody had murdered, or at least been convicted of murdering, an Eleventh Circuit Judge, he contended that he could not get a fair hearing from either Judge Coogler or any of the panel judges hearing his appeal. The Eleventh Circuit denied the motion to recuse. While the motion was denied and the denial was affirmed on appeal, therefore providing no support for the motion to recuse here, the Court will nevertheless note several key distinctions. First, Moody murdered an Eleventh Circuit Judge and then sought to recuse the judges-contending that they would not be fair. Here, Jeanne McCallan had no hand in the email and there is no reason to believe that the undersigned would attribute its insults and other contents to her. Further, in the instant case, the offending parties are the lawyers. Fritz's law license has already been suspended with further proceedings pending, and the Court is taking action to sanction Widerman for his part in this. Thus, the miscreants are being dealt with, without having any impact on Jeanne McCallan. Second, Moody murdered Judge Vance. As reprehensible as Fritz's and Widerman's actions are, they do not begin to approach the kind of action taken by Moody. A murder and an insult are two quite different things. Third, if Jeanne McCallan really believed that the filing of the email might prejudice her case, she should have fired Widerman and not moved to recuse the undersigned. It would be an anomalous state of affairs if the wrongdoing lawyer were to stay in the case while the judge who was victimized by a scurrilous attack was required to recuse.

The Defendant also cites *United States v. State of Alabama*, 828 F.2d 1532 (11th Cir. 1987) in support of her motion. The District Court's judgment in that case was reversed on a finding that the trial judge had impermissible prior contact with facts which were in dispute. The analysis in *U.S. v. Alabama* was technical and quite detailed. Suffice to say, nothing of the kind is alleged here. The undersigned has had no extrajudicial contact with the Defendant or any of the parties in issue here. While the undersigned has decided a number of matters involving Timothy McCallan, prior judicial proceedings rarely, if ever, provide a basis for recusal. *Liteky v. United States*, 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).

Case 18-03084   Doc 203   Filed 03/01/22   Entered 03/01/22 14:23:46   Desc Main
Document      Page 36 of 53

> An objective reader of the email and a fair reading of the case law on Motions to Recuse yields the conclusion that the motion was frivolous and the email was not really intended to support a meaningless motion. Rather, the email was intended to insult, injure, and provoke. Widerman's appearance in Court at the October 4 hearing on the show cause hearing was provocative. There is no support for the proposition that a lawyer may insult a judge and his colleague in vile and obscene terms and then insist that the judge recuse because he would not be seen as unbiased after such a vicious attach.
>
> The Eleventh Circuit rejected such a proposition in *In re Evergreen Security*, where a litigant made a vicious and prolonged attack on Judge Briskman. 570 F.3d 1257, 1279 (recognizing that "[r]equiring recusal for all disruptive, recalcitrant and disagreeable commentary would undermine the judiciary"). Widerman was looking to start a fight, which he hoped would result in a recusal and delay of these proceedings.

*Wilkins v. McCallan (In re McCallan)*, 633 B.R. 903, 909-10 (Bankr. M.D. Ala. 2021). This Court properly denied Jeanne's Motion to Recuse and it properly imposed sanctions against Scott Widerman for filing a copy of the offending email on the Court's public record, without redacting the offending portions of the email or moving the Court to seal the record. To be sure, the Fritz email is an embarrassment, and Widerman took the embarrassing email and spread it of record, increasing the embarrassment. But Bankruptcy Judges are used to rough treatment and the response to the offending email is being properly visited upon Fritz and Widerman, without prejudice to Jeanne. The Motion to Recuse was properly denied.

## D. Wilkins' Fraudulent Transfer Claims

### 1. Wilkins Has Standing to Bring Suit Pursuant to § 544(b).

The Trustee seeks to recover almost $6 million in cash transfers made by McCallan, either in his own name or through any number of alter egos, to his wife Jeanne. The transfers are avoidable as fraudulent transfers under 11 U.S.C. § 548(a)(1)(B) and pursuant to the Trustee's strong-arm powers under 11 U.S.C. § 544 and New York state law and Florida state law. Pursuant to Bankruptcy Code §§ 548 and 544, a trustee has standing to bring actions to recover fraudulent transfers under both bankruptcy and state law.

11 U.S.C. § 548(a)(1)(A) and (B) provides in relevant part as follows:

(a) (1) The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily –

> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
> (B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; . . . .

11 U.S.C. § 544(b)(1) provides in relevant part as follows:

(b) (1). . . [T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 . . . .

-38-

"Under 11 U.S.C. § 544(b), a trustee in bankruptcy may 'step into the shoes' of an unsecured creditor and void a transfer of an interest in the debtor's property that the unsecured creditor would have the power to void under federal or state law." *Int'l Pharmacy & Disc. II, Inc., In re*, 158 F. App'x 256, 259 (11th Cir. 2005) (citing *In re Graham,* 747 F.2d 1383, 1386–87 (11th Cir.1984)). As such, under § 544(b)(1), the Trustee is authorized to avoid any transfer which an unsecured creditor could have avoided under applicable state law, in this case, 273, 273- a, 274, 275, and 276 of New York Debtor & Creditor Law and 726.105 and 726.106 of the Florida Statutes.[11] Both DCL §§ 273, 273-a, 274, 275, and 276 and Fla. Stat. §§ 726.105 and 726.106 allow recovery by creditors of conveyances that are both constructively fraudulent and actually fraudulent.

To bring an action under § 544(b), the Trustee must identify an actual creditor. *Gordon v. Rogich (In re Alpha Protective Svcs., Inc.)*, 570 B.R. 888, 891-92 (Bankr. M.D. Ga. 2017). In this case, Wilkins holds a judgment for $102 million against McCallan, as trustee in bankruptcy for the Allegro entities. Thus, she is an actual creditor in this case.

---

[11] Since the filing of the Complaint and Amended Complaint, New York has repealed the fraudulent conveyance statutes in effect at the time of the conveyances at issue in this case: in December 2019, the New York State Legislature repealed the original Article 10 of New York's Debtor and Creditor Law (which included DCL §§ 270–281) and implemented the Uniform Voidable Transactions Act as the new Article 10, which took effect on April 4, 2020. See 2019 N.Y. Sess. Laws Ch. 580 (A. 5622) (McKinney's). Nevertheless, "the pre-amendment version of Article 10 is operative here because the new law does not apply to a transfer made or obligation incurred before [the act's] effective date, [April 4, 2020], nor shall it apply to a right of action that has accrued before such effective date." *Saadeh v. Kagan*, No. 20CV01945PAESN, 2021 WL 5827942, at *3 (S.D.N.Y. Oct. 20, 2021), *report and recommendation adopted*, No. 20CIV1945PAESN, 2021 WL 5827653 (S.D.N.Y. Dec. 8, 2021) (quoting *Ray v. Ray*, No. 20-cv-06720 (PAE), 2021 WL 1164655, at *4 (S.D.N.Y. Mar. 25, 2021) (quoting 2019 N.Y. Sess. Laws Ch. 580)) (internal quotations omitted); *see Ray v. Ray*, 799 F. App'x 29, 31 n.1 (2d Cir. 2020). All statutory references will correspond to the pre-amendment version of Article 10.

## 2. The Applicable Law Here is New York Law and Florida Law.

Wilkins alleges claims under New York law and Florida law under two theories, constructive fraud and actual fraud.  As this Court previously established in *In re McCallan*, 629 B.R. 491, 504 (Bankr. M.D. Ala. 2021), McCallan was domiciled in New York until his domicile changed to Florida on September 7, 2016.  Accordingly, any transfers made prior to September 7, 2016 will be examined under New York law and any transfers made since September 7, 2016 will be examined under Florida law.

### a. Constructive Fraud - Fraudulent Transfers Under N.Y. DCL §§ 273, 273-a, 274, and 275 and Under Fla. Stat. §§ 726.105(1)(b) and 726.106(1)

N.Y. DCL §§ 273, 273-a, 274, and 275 allows for the recovery of constructively fraudulent conveyances.  Under §§ 273, 273-a, 274, and 275, a transfer made by a debtor is deemed constructively fraudulent if it is made without "fair consideration," and if one of the following conditions is met:

> (i) the transferor is insolvent or will be rendered insolvent by the transfer in question, DCL § 273; (ii) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital, DCL § 274; or (iii) the transferor believes that it will incur debt beyond its ability to pay, DCL § 275.

*Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.),* 403 F.3d 43, 53 (2d Cir.2005).  "[U]nder DCL § 273–a if (1) it is 'made without fair consideration'; (2) 'the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him'; and (3) 'after final judgment for the plaintiff, the defendant fails

to satisfy the judgment.'" *Priestley v. Panmedix Inc.*, 18 F. Supp. 3d 486, 497 (S.D.N.Y. 2014); N.Y. Debt. & Cred. Law § 273–a.

Pursuant to N.Y. DCL § 272, fair consideration is given for property:

(a) When in exchange for such property, . . . as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or
(b) When such property, . . . is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, . . . .

As such, "fair consideration has two components—the exchange of fair value and good faith—and both are required." *SEC v. Universal Express, Inc.,* 2008 WL 1944803, at *5 (S.D.N.Y. Apr. 30, 2008) (citations omitted)). A presumption of fraud arises when transfers are made between family members without any evidence of consideration. *In re Khan*, No. 10-46901-ESS, 2014 WL 10474969, at *9 (E.D.N.Y. Dec. 24, 2014). Accordingly, intra-family transfers should be scrutinized more closely. *Id.*

Under N.Y. DCL § 273, when a debtor makes a conveyance without fair consideration, there is also a presumption of insolvency. *Geron v. Schulman (In re Manshul Constr. Corp.),* 2000 WL 1228866, at *53 (S.D.N.Y. Aug. 30, 2000); *see Feist v. Druckerman*, 70 F.2d 333, 334 (2d Cir. 1934) (". . . a voluntary conveyance made when the grantor is indebted is presumptively fraudulent . . . this means that, if one indebted makes such a transfer, it is presumed, . . . that he was then insolvent."); *Kim v. Ji Sung Yoo*, 311 F. Supp. 3d 598, 611 (S.D.N.Y. 2018), *aff'd sub nom. Tae H. Kim v. Ji Sung Yoo*, 776 F. App'x 16 (2d Cir. 2019) ("[T]he element of insolvency is presumed when a conveyance is made without fair consideration, and the burden of overcoming such presumption is on the transferee.") (citations omitted). A debtor is considered insolvent when the "present fair salable value of his assets is less than the amount that will be

required to pay his probable liability on his existing debts as they become absolute and matured." N.Y. Debt. & Cred. Law § 271. Courts often apply a balance sheet test to determine insolvency. *Kim v. Ji Sung Yoo*, 311 F. Supp. 3d at 611-12. "The operative reference point for determining insolvency is the time at which the transfer took place" and "insolvency of the transferor ... cannot be presumed from subsequent insolvency at a later point in time." *Kim v. Ji Sung Yoo*, 311 F. Supp. 3d at 612 (quoting *O'Toole v. Karnani (In re Trinsum Group, Inc.)*, 460 B.R. 379, 392 (Bankr. S.D.N.Y. 2011)). When the presumption of insolvency arises, the burden shifts to the transferee to prove the transferor's solvency. *In re Khan*, 2014 WL 10474969, at *9 (citing *Ackerman v. Ventimiglia (In re Ventimiglia)*, 362 B.R. 71, 83 (Bankr. E.D.N.Y. 2007).

Florida constructive fraudulent transfers are governed by sections 726.105(1)(b) and 726.106(1) of the Florida Statutes. "Florida Statutes §§ 726.105(1)(b) and 726.106(1) deal with transfers made by a debtor without receiving reasonably equivalent value in exchange for the obligation while the debtor was insolvent or intended to incur or believed or should have believed that he or she would incur debts beyond his or her ability to pay as they became due." *In re Goldberg,* 229 B.R. 877, 884 (Bankr.S.D.Fla.1998). Under Florida's constructive fraud statutes, actual intent to defraud is not required; instead, the trustee must show the debtor was insolvent at the time of the transfer and the debtor received less than reasonably equivalent value for the transfer. *In re Amelung*, No. 07-15492-BKC-PGH, 2010 WL 1417742, at *3 (Bankr. S.D. Fla. Apr. 7, 2010). Fla. Stat. § 726.013(1) provides that "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." While reasonably equivalent value is not defined by statute, courts may consider "the good faith

-42-

of the parties, the disparity between the fair value of the property and what the debtor actually received, and whether the transaction was at arm's length." *In re Leneve*, 341 B.R. 53, 57 (Bankr. S.D. Fla. 2006).

**b. Actual Fraud - Fraudulent Transfers Under N.Y. DCL § 276 and Under Fla. Stat. § 726.105(1)(a)**

N.Y. DCL § 276 allows for the recovery of actually fraudulent conveyances. "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." N.Y. Debt. & Cred. Law § 276. This section focuses on the actual intent of the transacting parties. "Under Section 276, a conveyance will be set aside regardless of the adequacy of consideration where the party seeking to set aside the conveyance can prove the debtor's actual intent to hinder and delay creditors." *Aaron v. Mattikow*, 225 F.R.D. 407, 412–13 (E.D.N.Y. 2004) (citing *Hassett v. Goetzmann,* 10 F.Supp.2d 181, 187 (N.D.N.Y.1998) (citing *United States v. Carlin, \*413* 948 F.Supp. 271, 277 (S.D.N.Y.1996)); *Elgin Sweeper Co. v. Melson, Inc.,* 884 F.Supp. 641, 649 (N.D.N.Y.1996)).

Fla. Stat. § 726.105(1)(a) allows for the recovery of fraudulent transfers that constitute actual fraud. Section 726.105 states that:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> (a) With actual intent to hinder, delay, or defraud any creditor of the debtor; .
> . . .

-43-

F.S.A. § 726.105. "The statute requires '[1] a creditor to be defrauded, [2] a debtor intending fraud, [3] and a conveyance of property which is applicable by law to the payment of the debt due.'" *Wiand v. Lee*, 753 F.3d 1194, 1199–200 (11th Cir. 2014) (quoting Johnson v. Dowell, 592 So.2d 1194, 1196 (Fla. 2d DCA 1992)).

Actual intent under N.Y. DCL § 276 and Fla. Stat. § 726.105(1)(a) is difficult to prove through direct evidence and may be inferred from the facts and circumstances surrounding the transfer that give rise to an inference of intent; these patterns of conduct are referred to as "badges of fraud." *Kim v. Ji Sung Yoo*, 311 F. Supp. 3d at 612; *S.E.C. v. Smith*, 646 Fed.Appx. 42, 45 (2d Cir. 2016); *In re Sharp*, 403 F.3d at 56; *In re McCarn's Allstate Fin., Inc.*, 326 B.R. 843, 849 (Bankr. M.D. Fla. 2005) These badges of fraud include:

(1) the lack or inadequacy of consideration;
(2) the family, friendship or close associate relationship between the parties;
(3) the retention of possession, benefit or use of the property in question;
(4) the financial condition of the party sought to be charged both before and after the transaction in question;
(5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and
(6) the general chronology of the events and transactions under inquiry.

*Kim v. Ji Sung Yoo*, 311 F. Supp. 3d at 612; *Ford Motor Credit Co. LLC v. Orton–Bruce*, No. 14 Civ. 5382 (KMK), 2017 WL 1093906, at *9 (S.D.N.Y. Mar. 22, 2017) (citation omitted); *see also In re Kaiser*, 722 F.2d 1574, 1582–83 (2d Cir. 1983); *see also* Fla. Stat. § 726.105(2)(a)-(k) (providing a non-exhaustive list of badges of fraud) and *Levine v. Weissing (In re Levine)*, 134 F.3d 1046, 1053 (11th Cir. 1998) (adopting the badges of fraud set out on Fla. Stat. § 726.105(2)(a)-(k)).

-44-

### 3. Post-Petition Transfers Pursuant to § 549

The Trustee's power to avoid post-petition transfers of estate property is governed by section 549, which provides that:

> (a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate--
> (1) that occurs after the commencement of the case; and
> (2) (A) that is authorized only under section 303(f) or 542(c) of this title; or
> (B) that is not authorized under this title or by the court.
>
> * * *
>
> (d) An action or proceeding under this section may not be commenced after the earlier of–
> (1) two years after the date of the transfer sought to be avoided; or
> (2) the time the case is closed or dismissed.

11 U.S.C. § 549. Section 549 applies to debtor-initiated transfers and its purpose is to prevent a debtor from making an unauthorized post-petition transfer of estate property. *In re Striblin*, 349 B.R. 301, 303 (Bankr. M.D. Fla. 2006). To avoid a transfer under Section 549(a) a trustee need only demonstrate: (1) a post-petition transfer (2) of estate property (3) which was not authorized by the Bankruptcy Code or the court. *In re Delco Oil, Inc.*, 599 F.3d 1255, 1258 (11th Cir. 2010).

-45-

**4. Analysis – The Trustee has Established Claims for Constructive Fraud and Actual Fraud and Avoidable Post-Petition Transfers.**

The evidence established that cash transfers totaling $5,607,679.06, were made by McCallan to Jeanne on various dates between 2007 and 2017.[12] All of the transfers were made by McCallan or entities that are alter egos of McCallan. *See*, Part I(B), and Part I(c), *supra*.

It was established at trial that none of the transfers were made for adequate consideration. Most of the transfers, by amount, were for disguised or bogus wages. That is, Jeanne was paid wages or compensation by a number of the entities, but the evidence established that she did not perform any services of value. *See*, Part I(E)(1), *supra*. Both McCallan and Jeanne testified at trial that she was an integral part of the operations of these businesses. Yet, Wilkins noted that a massive amount of discovery was done in AP 11-3007, a substantial part of which was to identify the responsible individuals so they could be named as Defendants. McCallan was the only individual that had any substantial management authority. Jeanne did not sign any tax returns or other corporate documents. Other than a few emails which she sent, that did not show that she had any significant responsibility, Jeanne could not substantiate her claim that she performed valuable services for the McCallan business entities. Wilkins proved, with a preponderance of the evidence, that Jeanne did not provide adequate consideration for the transfers made to her.

The evidence established that McCallan was insolvent by January 1, 2007, and probably some time before that, through the date of trial. Part I(D), *supra*. McCallan has, for many years, been engaged in a fraudulent debt management and debt consolidation business. He is

---

[12] A complete list of the transfers is shown on a three-page Appendix following this Memorandum Decision.

-46-

liable to the customers (or victims) of this business activity. The most interesting aspect of this case is the inconsistency of McCallan's claim that he is broke, when it comes to paying the judgment entered against him in AP 11-3007, yet Jeanne claims that he is solvent for purposes of the Trustee's fraudulent conveyance action. To establish McCallan's solvency, one would have to provide financial statements showing that he was solvent, at the time the transfers in question were made, and then explain how McCallan lost his money. Neither Jeanne nor McCallan has to this day, attempted to make such a showing. If McCallan did so, no doubt he would be providing Wilkins a road map to his concealed wealth.

In the alternative, Wilkins has established her actual fraud claim, in addition to the constructive fraud claim discussed immediately above. As set out in Part I(A), *supra*, McCallan has a long history of dishonest and fraudulent activities, both in dealing with his customers and in his dealings with Wilkins. The transfers in question were made to his wife, the closest of insiders. The Court finds that Wilkins has proven by clear and convincing evidence that McCallan made all of these transfers with the actual intent to hinder, delay, and defraud creditors.

### 5. Jeanne's Defenses Regarding Subsequent Transfers in Unavailing

It appears that Jeanne raised two defenses, that have not been addressed in connection with the discussion above. First, she offered considerable evidence as to what Jeanne did with the money that was transferred to her. Second, she contends that transferors, who were not parties in AP 11-3007, are not within the jurisdiction of the Court and, therefore, the transfers from them cannot support a fraudulent conveyance claim. (Doc. 196). The Court will address

Case 18-03084   Doc 203   Filed 03/01/22   Entered 03/01/22 14:23:46   Desc Main
Document      Page 47 of 53

these claims in order.

At trial, Jeanne called as a witness her long-time friend and bookkeeper Kelly Eckstein who gave several hours of testimony on October 5 and 6, 2021. Much of that testimony was to show what Jeanne did with the money transferred to her. By and large, she did not dispute the fact that the transfers in question were made. Jeanne and her lawyer appear to argue that, to the extent that they could show what was done with the money, there was no fraudulent conveyance. While Jeanne did not address this in her Proposed Findings of Fact and Conclusions of Law submitted after trial, because so much time during the trial was spent on this contention, the Court will at least mention it here. A cause of action for a fraudulent conveyance is complete once the transfer is made and the elements of the cause of action are proven, by a preponderance of the evidence for a constructive fraud case and by clear and convincing evidence for an actual fraud case. *Kim v. Ji Sung Yoo*, 311 F. Supp. 3d at 610. Regardless of what was done with the money by Jeanne, after she had received a fraudulent conveyance, it has no effect on these proceedings.

The second contention to be addressed is that most of nominal transferors, were not judgment defendants in the $102 million judgment entered February 16, 2016, in AP 11-3007. The judgment debtors are Americorp, Inc., Seton, Inc., and McCallan. It is undisputed that other than McCallan, none of the other nominal transferors in this proceeding are judgment debtors. Rather, the contention is that they are alter egos of McCallan. *See*, Part I(C). In the event Wilkins' contention that the transferors in question could not be shown to be alter egos of McCallan, then transfers from them could not have supported a finding that they were fraudulent conveyances may by McCallan. However, in light of this Court's finding that said

nominal transferors are simply alter egos of McCallan, Jeanne's defense against these fraudulent

transfers is without merit.

## 6. Jeanne is Liable Under 11 U.S.C. § 550(a).

This Court has determined that McCallan made transfers to Jeanne totaling

$5,607,679.06. These transfers are avoidable as fraudulent transfers pursuant to 11 U.S.C. §

548(a)(1)(B) and the Trustee's strong-arm powers under 11 U.S.C. § 544 and New York and

Florida state law, and as post-petition transfers pursuant to 11 U.S.C. § 549. It follows that the

Court must examine Jeanne's liability as the transferee of the avoided transfer. *See In re Delco*

*Oil, Inc.*, 599 F.3d at 1259 ("Once a court finds a transfer avoidable, Section 550(a) allows the

trustee to recover the property transferred from the initial transferee."). 11 U.S.C. § 550(a)(1)

provides in relevant part that "to the extent that a transfer is avoided under section 544, . . . 548,

[or] 549 . . . , the trustee may recover, for the benefit of the estate, the property transferred, or,

if the court so orders, the value of such property, from -- the initial transferee of such transfer

. . . ." 11 U.S.C. § 550(a)(1). This Court makes no finding as to whether Jeanne, as the

transferee, had knowledge the transfers from McCallan were fraudulent, as that inquiry is

irrelevant. *See In re McCarn's Allstate Fin., Inc.*, 326 B.R. at 853 (noting that under § 550, even

the innocent transferee is liable for fraudulently transferred funds). As established, Jeanne

received transfers totaling $5,607,679.06 from McCallan between 2007 and 2017. Accordingly,

the Trustee has established Jeanne as the initial transferee with the meaning of 11 U.S.C. §

550(a)(1).

### III. CONCLUSION

Timothy McCallan, the Debtor in the underlying bankruptcy case, made cash transfers totaling $5,607,679.06 to his wife, Jeanne McCallan, the Defendant in this Adversary Proceeding. The transfers were made either by McCallan, or entities so controlled and dominated by him as to be his alter egos. The transfers were made for no consideration while McCallan was insolvent. In the alternative, McCallan made these transfers with the actual intent to hinder, delay, and defraud his creditors. The Court will enter judgment by way of a separate document.

Done this 1st day of March, 2022.

William R. Sawyer
United States Bankruptcy Judge

c:     Steve Olen, Attorney for Plaintiff
Carly B. Wilkins
Scott D. Widerman, Attorney for Defendant
Orin Clayton Odom, III, Attorney for Defendant

-50-

# APPENDIX

| Transferor | Transferee | Date | Type of Transfer | Amount |
|---|---|---|---|---|
| Intermark Communications, Inc. | Jeanne McCallan | Tax Year 2007 | Disguised Wages | $2,054,923.10 |
| Intermark Communications, Inc. | Jeanne McCallan | Tax Year 2008 | Disguised Wages | $482,049.48 |
| Intermark Communications, Inc. | Jeanne McCallan | Tax Year 2009 | Disguised Wages | $455,852.00 |
| Intermark Communications, Inc. | Jeanne McCallan | Tax Year 2010 | Disguised Wages | $450,080.54 |
| Intermark Communications, Inc. | Jeanne McCallan | Tax Year 2011 | Disguised Wages | $17,310.39 |
| The Achievable, Inc. | Jeanne McCallan | Tax Year 2007 | Disguised Wages | $35,715.00 |
| The Achievable, Inc. | Jeanne McCallan | Tax Year 2008 | Disguised Wages | $84,907.63 |
| The Achievable, Inc. | Jeanne McCallan | Tax Year 2009 | Disguised Wages | $124,676.00 |
| The Achievable, Inc. | Jeanne McCallan | Tax Year 2010 | Disguised Wages | $92,741.39 |
| WAV Team, Inc. | Jeanne McCallan | Tax Year 2011 | Disguised Wages | $38,461.50 |
| WAV Team, Inc. | Jeanne McCallan | Tax Year 2011 | Disguised Wages | $11,538.45 |
| Vortex Debt Group | Jeanne McCallan | Tax Year 2011 | Disguised Wages | $34,615.35 |
| Timothy McCallan[1] | Hello Performance | 5/25/2012 | Gold Sale | $49,401.00 |
| Timothy McCallan | Hello Performance | 5/26/2012 | Gold Sale | $49,401.00 |
| Timothy McCallan | Hello Performance | 12/13/2011 | Wire | $108,675.00 |
| Timothy McCallan | Hello Performance | 1/18/2012 | Wire | $85,000.00 |
| Timothy McCallan | Hello Performance | 2/1/2012 | Wire | $6,900.00 |
| Timothy McCallan | Hello Performance | 2/1/2012 | Wire | $2,900.00 |
| Timothy McCallan | Hello Performance | 3/21/2012 | Wire | $13,500.00 |
| The Achievable, Inc.[2] | Hello Performance | 4/3/2012 | Wire | $12,000.00 |
| WAV Team, Inc.[3] | Hello Performance | 4/19/2012 | Wire | $15,000.00 |
| WAV Team, Inc. | Hello Performance | 4/23/2012 | Wire | $13,500.00 |
| Timothy McCallan | Hello Performance | 5/15/2012 | Wire | $26,000.00 |
| Vortex Debt Group | Jeanne McCallan | 11/9/2012 | Wire | $2,000.00 |
| Vortex Debt Group | Jeanne McCallan | 11/15/2012 | Wire | $2,000.00 |
| Vortex Debt Group | Jeanne McCallan | 11/21/2012 | Wire | $2,000.00 |
| Vortex Debt Group | Jeanne McCallan | 11/30/2012 | Wire | $2,000.00 |
| Vortex Debt Group | Jeanne McCallan | 12/7/2012 | Wire | $2,000.00 |
| Vortex Debt Group | Jeanne McCallan | 12/14/2012 | Wire | $2,000.00 |
| Vortex Debt Group | Jeanne McCallan | 12/21/2012 | Wire | $2,000.00 |
| Vortex Debt Group | Jeanne McCallan | 12/28/2012 | Wire | $2,000.00 |
| Vortex Debt Group | Jeanne McCallan | 1/14/2013 | Wire | $2,000.00 |
| Vortex Debt Group | Jeanne McCallan | 1/18/2013 | Wire | $2,000.00 |
| Vortex Debt Group | Jeanne McCallan | 2/1/2013 | Wire | $1,000.00 |
| Vortex Debt Group | Jeanne McCallan | 2/15/2013 | Wire | $1,000.00 |
| Vortex Debt Group | Jeanne McCallan | 2/25/2013 | Wire | $2,000.00 |
| Vortex Debt Group | Jeanne McCallan | 3/1/2013 | Wire | $2,000.00 |
| Vortex Debt Group | Jeanne McCallan | 3/8/2013 | Wire | $2,000.00 |
| Vortex Debt Group | Jeanne McCallan | 3/15/2013 | Wire | $2,000.00 |
| Vortex Debt Group | Jeanne McCallan | 3/22/2013 | Wire | $2,000.00 |
| Vortex Debt Group | Jeanne McCallan | 3/29/2013 | Wire | $2,000.00 |
| Vortex Debt Group | Jeanne McCallan | 4/5/2013 | Wire | $2,000.00 |
| Vortex Debt Group | Jeanne McCallan | 4/12/2013 | Wire | $2,000.00 |
| Vortex Debt Group | Jeanne McCallan | 4/19/2013 | Wire | $2,600.00 |
| Vortex Debt Group | Jeanne McCallan | 4/26/2013 | Wire | $2,600.00 |
| Vortex Debt Group | Jeanne McCallan | 5/3/2013 | Wire | $2,600.00 |
| Vortex Debt Group | Jeanne McCallan | 5/10/2013 | Wire | $2,600.00 |
| Vortex Debt Group | Jeanne McCallan | 5/17/2013 | Wire | $2,600.00 |
| Vortex Debt Group | Jeanne McCallan | 5/24/2013 | Wire | $2,600.00 |

| | | | | |
|---|---|---|---|---|
| Vortex Debt Group | Jeanne McCallan | 5/31/2013 | Wire | $2,600.00 |
| Vortex Debt Group | Jeanne McCallan | 6/7/2013 | Wire | $2,600.00 |
| Vortex Debt Group | Jeanne McCallan | 6/14/2013 | Wire | $2,600.00 |
| Vortex Debt Group | Jeanne McCallan | 6/21/2013 | Wire | $2,800.00 |
| Vortex Debt Group | Jeanne McCallan | 7/5/2013 | Wire | $5,600.00 |
| Vortex Debt Group | Jeanne McCallan | 7/12/2013 | Wire | $2,800.00 |
| Vortex Debt Group | Jeanne McCallan | 7/19/2013 | Wire | $2,800.00 |
| Vortex Debt Group | Jeanne McCallan | 7/29/2013 | Wire | $2,800.00 |
| Vortex Debt Group | Jeanne McCallan | 8/5/2013 | Wire | $2,800.00 |
| Vortex Debt Group | Jeanne McCallan | 8/16/2013 | Wire | $2,800.00 |
| Vortex Debt Group | Jeanne McCallan | 8/28/2013 | Wire | $2,800.00 |
| Vortex Debt Group | Jeanne McCallan | 9/9/2013 | Wire | $2,800.00 |
| Vortex Debt Group | Jeanne McCallan | 9/16/2013 | Wire | $2,800.00 |
| Vortex Debt Group | Jeanne McCallan | 9/25/2013 | Wire | $2,800.00 |
| Vortex Debt Group | Jeanne McCallan | 10/11/2013 | Wire | $2,600.00 |
| Vortex Debt Group | Jeanne McCallan | 10/28/2013 | Wire | $1,000.00 |
| Vortex Debt Group | Jeanne McCallan | 11/8/2013 | Wire | $2,000.00 |
| Vortex Debt Group | Jeanne McCallan | 11/22/2013 | Wire | $1,000.00 |
| Vortex Debt Group | Jeanne McCallan | 12/6/2013 | Wire | $1,000.00 |
| Vortex Debt Group | Jeanne McCallan | 12/13/2013 | Wire | $1,200.00 |
| Vortex Debt Group | Jeanne McCallan | 12/19/2013 | Wire | $1,000.00 |
| Vortex Debt Group | Jeanne McCallan | 1/14/2014 | Wire | $1,050.00 |
| Vortex Debt Group | Jeanne McCallan | 1/27/2014 | Wire | $2,000.00 |
| Vortex Debt Group | Jeanne McCallan | 1/27/2014 | Wire | $2,000.00 |
| Vortex Debt Group | Jeanne McCallan | 2/18/2014 | Wire | $500.00 |
| Vortex Debt Group | Jeanne McCallan | 3/24/2014 | Wire | $70,000.00 |
| Vortex Debt Group | Jeanne McCallan | 6/20/2014 | Wire | $850.00 |
| Vortex Debt Group | Jeanne McCallan | 1/6/2015 | Wire | $3,000.00 |
| Vortex Debt Group | Jeanne McCallan | 1/30/2015 | Wire | $3,000.00 |
| Vortex Debt Group | Jeanne McCallan | 3/3/2015 | Wire | $3,000.00 |
| Vortex Debt Group | Jeanne McCallan | 3/31/2015 | Wire | $3,000.00 |
| Vortex Debt Group | Jeanne McCallan | 4/30/2015 | Wire | $2,900.00 |
| Vortex Debt Group | Jeanne McCallan | 6/1/2015 | Wire | $3,000.00 |
| Vortex Debt Group | Jeanne McCallan | 6/10/2015 | Wire | $3,000.00 |
| Vortex Debt Group | Jeanne McCallan | 10/2/2015 | Wire | $10,000.00 |
| Vortex Debt Group | Jeanne McCallan | 10/31/2015 | Wire | $5,000.00 |
| Vortex Debt Group | Jeanne McCallan | 12/15/2015 | Wire | $3,000.00 |
| WAV Team, Inc. | Jeanne McCallan | 9/2/2015 | Check | $12,806.56 |
| Clear Blue Debt Solutions | Jeanne McCallan | 6/30/2015 | Wire | $3,600.00 |
| Clear Blue Debt Solutions | Jeanne McCallan | 7/13/2015 | Wire | $5,000.00 |
| Clear Blue Debt Solutions | Jeanne McCallan | 8/10/2015 | Wire | $723.20 |
| Alpha Mar Group | Jeanne McCallan | 7/14/2015 | Disguised Fees | $3,680.00 |
| Alpha Mar Group | Jeanne McCallan | 7/14/2015 | Disguised Fees | $1,487.50 |
| Alpha Mar Group | Jeanne McCallan | 7/22/2015 | Disguised Fees | $1,799.50 |
| Alpha Mar Group | Jeanne McCallan | 10/24/2015 | Disguised Fees | $1,799.50 |
| Alpha Mar Group | Jeanne McCallan | 12/17/2015 | Disguised Fees | $3,498.00 |
| Timothy McCallan | Jeanne McCallan | 9/23/2016 | Credit Card Payment | $15,000.00 |

| | | | | |
|---|---|---|---|---|
| Island Punch Beverage, LLC | Jeanne McCallan | 6/13/2016 | Check | $4,800.00 |
| Island Vibes Worldwide Tours, LLC | Jeanne McCallan | 8/19/2016 | Check | $6,100.00 |
| Island Vibes Worldwide Tours, LLC | Jeanne McCallan | 9/16/2016 | Check | $16,000.00 |
| Birdman, LLC | Jeanne McCallan | 11/14/2011 | Wire | $50,000.00 |
| Birdman, LLC | Jeanne McCallan | 11/30/2011 | Wire | $50,000.00 |
| Birdman, LLC | Jeanne McCallan | 12/7/2011 | Wire | $250,000.00 |
| Birdman, LLC | Jeanne McCallan | 2/1/2012 | Wire | $75,000.00 |
| Birdman, LLC | Jeanne McCallan | 3/12/2012 | Wire | $150,000.00 |
| Birdman, LLC | Jeanne McCallan | 4/3/2012 | Wire | $50,000.00 |
| Birdman, LLC | Jeanne McCallan | 4/20/2012 | Wire | $23,000.00 |
| Birdman, LLC | Jeanne McCallan | 4/27/2012 | Wire | $77,000.00 |
| Birdman, LLC | Jeanne McCallan | 5/5/2012 | Wire | $150,000.00 |
| Birdman, LLC | Jeanne McCallan | 5/13/2014 | Wire | $91,000.00 |
| Birdman, LLC | Jeanne McCallan | 2/11/2015 | Wire | $18,000.00 |
| Birdman, LLC | Jeanne McCallan | 10/19/2015 | Wire | $20,000.00 |
| Birdman, LLC | Jeanne McCallan | 1/5/2016 | Wire | $30,000.00 |
| Birdman, LLC | Jeanne McCallan | 5/7/2017 | Wire | $12,136.97 |

**TOTAL**    **$5,607,679.06**

---

[1] On May 21, 2021, Debtor, Timothy McCallan transferred 100% of his ownership in Hello Performance to Defendant Jeanne McCallan. The sale of the gold bars took place after the corporate transfer of ownership.

[2] The Achievable, Inc. is 100% owned by Debtor Timothy McCallan.

[3] WAV Team, Inc. is 100% owned by Debtor Timothy McCallan.

Case 18-03084   Doc 203   Filed 03/01/22   Entered 03/01/22 14:23:46   Desc Main
Document   Page 53 of 53
Appendix 3